# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-11-00318-CR

**Thomas H. Adair, Sr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF BASTROP COUNTY, 21ST JUDICIAL DISTRICT
NO. 12,816, HONORABLE REVA TOWSLEE CORBETT, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Thomas H. Adair, Sr., of two counts of the offense of aggravated sexual assault of a child. *See* Tex. Penal Code § 22.021. For each count, punishment was assessed at ten years' imprisonment and a $10,000 fine, but the district court suspended imposition of each sentence and placed Adair on community supervision for five years. In four issues on appeal, Adair asserts that the jury verdict was not unanimous, that the district court abused its discretion in admitting evidence of Adair's pre-arrest silence and retention of counsel, and that trial counsel rendered ineffective assistance. We will affirm the judgments of conviction.

## BACKGROUND

The jury heard evidence that Adair had sexually assaulted his granddaughter, G.T., who was 15 years old at the time of trial. G.T. testified that, when she was approximately five years old, Adair began touching her "in not so public places." G.T. explained that "it started one day when

we were in the pool and he was going to throw me, like, into the water, and when he was picking me up he put his hand underneath my bathing suit bottoms and started touching me." G.T. specified that Adair touched the inside of her sexual organ using his fingers. After that, G.T. testified, "it happened almost every time we went swimming together." According to G.T., the "touching" was not limited to digital penetration. She explained that, one day, while Adair was babysitting G.T. at his house, he entered the room where she was playing video games, closed the door, got lubricant out of a cabinet, and then, in G.T.'s words, "[H]e got on the bed and knelt at my feet and pulled my pants down, and I think he just unzipped his, and then he put the lube on my vagina and he put his penis in my vagina." Afterwards, G.T. testified, Adair made her promise not to tell her grandmother, telling her, "This is our little secret." G.T. explained that this was the only time that Adair "put [his] penis in [her] vagina," but she also described other incidents when Adair had either attempted to engage or actually did engage in sexual conduct with her. G.T. eventually told her eight-year-old brother what was happening to her, but "He just kind of waved me off and didn't believe me." G.T. further testified that when she was nine years old, during another incident at the swimming pool, she told Adair to stop or else she would tell her grandmother. After that, G.T. recounted, Adair stopped, and the abuse ended.

Approximately two years after the abuse ended, G.T. made an outcry to her mother, Shelli Miller. Miller testified that during an argument with her daughter, G.T. had told her, "You've never been raped by your grandfather." Miller asked G.T. to specify the grandfather to which she was referring, and G.T. told her that it was Adair, who was also Miller's father. Miller then proceeded to call her mother, Paula Adair, told Paula what G.T. had said, and then listened as Paula told Adair what Miller had told her. Miller did not know what Adair said in response but

2

"heard him get upset." Miller then ended the call with Paula and called the Bastrop County Sheriff's Department, who told her to have G.T. write a statement describing the abuse. Miller asked G.T. to do so, and G.T. complied. The handwritten statement, which was admitted into evidence, contained the following: "From the age of 5 to 9. In the pool, in the music room, in the barn, in [Adair's] room. I told him no and I told him to stop. I snuck out one time so he couldn't do it."

While waiting for the police to arrive, Miller called Paula again and had a second conversation with her. Paula told Miller to ask G.T. questions about what had happened, and Miller proceeded to do so. Miller asked G.T. if it was "a full blown rape," to which G.T. responded, "Yes, it was a full blown rape." When this response was conveyed to Paula, Miller could hear Adair reply, in the background, "I never full blown raped that child." Shortly thereafter, Miller told Paula that she was "going to press charges" against Adair, and the conversation ended.

The case was investigated by Detective Joel Wade of the Bastrop County Sheriff's Department. Wade arranged for G.T. to be interviewed at the Children's Advocacy Center, and he observed the interview. Wade also interviewed Miller, obtained information from her regarding G.T.'s outcry, and then arranged for a sexual-assault examination to be performed on G.T. After that, Wade arranged a non-custodial interview with Adair, which we discuss in more detail as it becomes relevant to Adair's first and fourth issues on appeal, and an interview with Paula.

The interview of G.T. at the Children's Advocacy Center was conducted by forensic interviewer Mindy Graber. Graber testified that G.T. described the abuse to her (again using the word "rape" to describe what had happened), identified on a diagram the body parts that were involved, identified "Tom Adair" as the perpetrator, and indicated that the abuse had started when G.T. was five and continued until she was nine. G.T. also described Adair's body position during

3

the rape as "lying on top of her" and further specified that Adair had taken off his clothes and her clothes. G.T. added that "sometimes it hurt when he did it and sometimes it didn't hurt, and that it burned when she peed but usually a couple of hours after that it would stop."

The physical exam of G.T. was performed by Kassy Havel, a sexual assault nurse examiner. Havel testified that G.T. described the alleged abuse to her in detail, including identifying Adair as the perpetrator, the manner in which he had abused her, and the time period during which the abuse had occurred. During the exam, Havel observed no trauma to G.T.'s genitals. Dr. Beth Nauert, a pediatrician and expert in the area of child sexual abuse, reviewed Havel's report. Dr. Nauert testified that there was nothing in Havel's report that she found to be unusual and that she agreed with Havel's findings. Nauert further testified that when a physical examination is not performed until two years after penetration has occurred, "most likely . . . the examination of the child is going to be normal," with no signs of injury or trauma to the child's sexual organ.

The State also called Dr. William Carter, a psychologist in private practice with expertise in the area of child sexual abuse, whose testimony we discuss in more detail as it becomes relevant to Adair's third issue on appeal. During his testimony, Carter answered a series of hypothetical questions concerning the psychological and behavioral patterns often observed in the victims and perpetrators of child sexual abuse. The hypothetical questions closely mirrored the allegations in this case.

The defense called two witnesses. Patricia Crane, a sexual assault nurse examiner, testified that she had reviewed Havel's report and concluded that there was "no physical evidence of sexual assault." The other witness, J.S., a former childhood friend of G.T., testified without elaboration that G.T. "was a liar."

4

The jury found Adair guilty as charged and assessed punishment as noted above. The district court sentenced Adair in accordance with the jury's verdict. Adair subsequently filed a motion for new trial in which he alleged, among other grounds, that the jury verdict had not been unanimous. Following a hearing, the district court denied the motion for new trial. This appeal followed.

## ANALYSIS

### Jury unanimity

We first address Adair's second issue, in which he asserts that the jury verdict was not unanimous. Specifically, Adair claims that the district court abused its discretion in not individually polling the jurors and in not granting his motion for new trial when one of the jurors—after the guilty verdict had been entered and the jury had been released for the weekend prior to the punishment hearing—informed the district court that she did not agree with the verdict.

After the jury had concluded deliberating on Adair's guilt or innocence, the record reflects that the following occurred:

| | |
|---|---|
| The Court: | Thank you, please be seated. Has the jury reached a verdict? |
| Jury Foreperson: | Yes, Your Honor, we have. |
| The Court: | Will you hand it to the bailiff please. |
| | All right, this is cause number 12,816, the State of Texas versus Thomas Hugh Adair, Sr., in the District Court, Bastrop County Texas, 21st Judicial District. Verdict form: Count I. "We the jury find the defendant, Thomas Hugh Adair, Sr., guilty of the offense of aggravated sexual assault as alleged in Count I of the indictment. Signed by the presiding juror." |

5

> Verdict form two. Cause number 12,816, the State of Texas versus Thomas Hugh Adair, Sr., in the District Court, Bastrop County, Texas, 21st Judicial District. The verdict is: "We the jury find the defendant, Thomas Hugh Adair, Sr., guilty of the offense of aggravated sexual assault as alleged in Count II of the indictment. Signed by the presiding juror."
>
> Ladies and gentlemen of the jury, if this accurately reflects your verdict would you signify by raising your right hand. (All hands raised.)
>
> Let the record reflect that all 12 jurors have raised their right hand.

At that time, Adair did not request that the individual jurors be polled or otherwise object to the district court's procedure in confirming the unanimity of the jury's verdict. The district court then recessed the jurors for the weekend and announced that they would return on Monday morning for the punishment hearing. After the jurors were recessed, the district court announced that "this will be entered," apparently referring to the verdict.

The record further reflects that, approximately five minutes after the jury had been released for the weekend, a document that is characterized in the record as a "note and complaint" from one of the jurors was received by the district court. The district court subsequently had an off-the-record discussion with the parties regarding the note in chambers. Then, the district court, back on the record, explained what it planned to do in response to the note:

> After polling the jury one of the jurors called the court, upset and wanting to share information with the Court in regards to her answer when polled. What I am going to do, because of the information I have received from that juror is re-poll that jury first thing Monday morning to confirm, because she left here and five minutes later she was calling back and has written a letter to the Court that causes me some concern, to make sure that in the polling she answered correctly and honestly.

6

Because it is my job to get justice I will re-poll the jury first thing. If it is not unanimous I will send them back in to continue deliberations on guilt/innocence. They have signed a verdict and I understand completely what their response was in court, but when I am contacted immediately by a juror I have no choice but to act upon that and to not ignore anything, and that is what I shall do.

In regards to that, Mr. Adair's bonds will be restored for this weekend, he will appear Monday morning.

And you both, as I will, can look for case law because I have never heard of this happening but I cannot and will not ignore this as the Judge of this court who has sworn to uphold the law and to seek justice. Is this something I would rather not have happened? Of course. Is it something that I will ignore? No, I will not.

The proceedings were then recessed for the weekend.

On Monday morning, the district court again indicated to the parties that it was planning to poll each of the jurors individually upon their return to the courtroom. However, before doing so, the district court wanted to discuss the matter further with the parties and, for purposes of that discussion, read the note from the juror into the record:

It was not a unanimous on count one of aggravated sexual assault. I was never convinced of this and was taken into the courtroom assuming that count one was a non-guilty and count two was guilty. We all agreed he would be labeled as a sex offender regardless if he was guilty of one or two charges and that during punishment he would get what was deserved. I was extremely upset in the courtroom. I request that I not return on Monday for sentencing. There was one other that was undecided for guilty on the first count as well.

Based on the contents of the juror's note, Adair argued that the verdict was not unanimous and moved that the jurors be individually polled. Adair also moved for a mistrial based on what he contended was a non-unanimous verdict. The State objected to the proposed jury poll, arguing that a unanimous verdict had already been entered into the record and accepted by the district court on

7

Friday afternoon and that "to go back and poll the jury at this point would cloud the record for appellate purposes." After further discussion and consideration of the matter, the district court denied Adair's motion to individually poll the jurors. In response to additional argument from Adair, the district court stated, "I also want to tell you, and I want to note on the record, that the Court polled all 12, and when asked all 12, including [the complaining juror], affirmed in open court that it was her verdict." The district court added, "When I polled them it was as to their verdict, meaning both verdicts, and it was quite clear to me. . . . But it was quite clear to me that they all 12 affirmed both verdicts in open court last Friday. And I'm just saying that on the record."

The case then proceeded to the hearing on punishment. Following its deliberation on punishment, the jury returned to the courtroom with its punishment verdict. The district court announced the verdict as to each count, including the earlier finding of guilt, and then polled the jury, asking each individual juror, "Is this your verdict on both counts?" The record reflects that each juror, including the juror who had earlier written the note, individually answered in the affirmative.

Adair subsequently filed a motion for new trial based in part on a claim of jury misconduct relating to the alleged lack of unanimity in the verdict. Attached to Adair's motion was an affidavit by the same juror who had earlier claimed in the note that she did not agree with the verdict. In the affidavit, the juror described in detail the deliberation process, asserted that she had felt pressured by other jurors to vote guilty, and claimed that she did not agree that Adair was guilty as to either count of the indictment. The State filed a "motion to quash" both the affidavit and the earlier note by the juror, asserting that both documents contained information about the jury deliberation process and were thus inadmissible. *See* Tex. R. Evid. 606(b). At the hearing on the

8

motion for new trial, the district court granted the State's "motion to quash" and subsequently denied the motion for new trial.

On appeal, Adair asserts that the verdict in this case was not unanimous and that the non-unanimous verdict was "facilitated" by improper procedures utilized by the district court in confirming the verdict. First, Adair contends that the manner in which the district court confirmed the verdict was improper. Specifically, Adair asserts that the district court should have (1) called the name of each juror separately and asked each juror whether the verdict was his or hers and (2) polled the jurors as to each count of the indictment. These complaints, however, were not preserved below. At the time the verdict was announced, Adair did not request a jury poll or otherwise object to any aspect of the district court's procedure in confirming the verdict. Consequently, these complaints are waived. *See Reese v. State*, 773 S.W.2d 314, 317 (Tex. Crim. App. 1989); *Neal v. State*, 689 S.W.2d 420, 427-28 (Tex. Crim. App. 1984); *Mathis v. State*, 471 S.W.2d 396, 398 (Tex. Crim. App. 1971); *Partida v. State*, 133 S.W.3d 738, 743 (Tex. App.—Corpus Christi 2003, no pet.); *Wood v. State*, 87 S.W.3d 735, 739 (Tex. App.—Texarkana 2002, no pet.); *see also* Tex. R. App. P. 33.1(a).

Adair also asserts that the district court abused its discretion in failing to grant his motion to poll the jury on the Monday morning after the verdict had been entered. We disagree. The procedures for polling the jury are mandated by statute:

> The State or the defendant shall have the right to have the jury polled, which is done by calling separately the name of each juror and asking him if the verdict is his. If all, when asked, answer in the affirmative, the verdict shall be entered upon the minutes; but if any juror answer in the negative, the jury shall retire again to consider its verdict.

9

Tex. Code Crim. Proc. art. 37.05. "The purpose of the jury poll is to ensure that 'one of the prerequisites of a valid verdict[,] unanimity[,] has been achieved.'" *Ex parte Aviles*, 78 S.W.3d 677, 683 (Tex. App.—Austin 2002, no pet.) (quoting *United States v. Love*, 597 F.2d 81 (6th Cir. 1979)). Thus, the jury poll is conducted prior to the verdict being entered. After the verdict is entered, the jury is not allowed to reconvene and either correct its verdict or re-deliberate on a matter that it has already decided. *See White v. State*, 492 S.W.2d 281, 282-83 (Tex. Crim. App. 1973); *West v. State*, 340 S.W.2d 813, 815 (Tex. Crim. App. 1960); *Cook v. State*, 361 S.W.3d 235, 240 (Tex. App.—Fort Worth 2012), *aff'd in part and modified in part*, No. PD-0344-12, 2013 WL 331342 (Tex. Crim. App. Jan. 30, 2013). There is a narrow exception to this rule. If the jurors have not separated or have separated only momentarily, are still in the presence of the court, and it appears that no one has talked to the jurors about the case, the trial court may recall the jurors to correct their verdict. *Webber v. State*, 652 S.W.2d 781, 782 (Tex. Crim. App. 1983); *West*, 340 S.W.2d at 319; *Cook*, 361 S.W.3d at 240.

In accordance with the above, Texas courts have held that after the verdict has been entered and the jury has separated more than momentarily, the trial court cannot reconvene the jury to either re-deliberate or be polled on its verdict. *See Cook*, 361 S.W.3d at 238-39, 240-41 (after verdict had been entered and jury had been discharged for seven minutes, trial court polled jurors and subsequently allowed jury to re-deliberate; appeals court held that this was improper and abuse of discretion); *Wood*, 87 S.W.3d at 739 (concluding that after defendant declined to request jury poll and guilty verdict had been accepted, defendant was not entitled to have jury re-deliberate on issue of defendant's guilt after jury had separated overnight, even though day after guilty verdict was announced and prior to punishment, one juror indicated to trial court that she had "doubt" concerning

10

defendant's guilt); *see also Phan v. State*, No. 01-96-01228-CR, 2000 Tex. App. LEXIS 3771, at *6-7 (Tex. App.—Houston [1st Dist.] June 8, 2000, no pet.) (not designated for publication) (defendant requested jury poll in response to comments by jury foreperson day after guilty verdict was announced; appeals court held that "[b]ecause the jurors had separated overnight, it would have been improper to recall the jurors to poll them").

In this case, at the time Adair moved to have the jury polled, the jurors had been separated and outside of the court's presence for the entire weekend after their guilty verdict had been announced. Additionally, after the guilty verdict as to each count had been announced, all twelve of the jurors had indicated by a show of hands that the verdict was unanimous, neither party had requested individual polling of the jurors or otherwise objected to the district court's procedure in confirming that the verdict was unanimous, and the district court had entered the jury's unanimous verdict. Consequently, the district court would not have abused its discretion in concluding that a jury poll conducted on Monday, when the verdict had been entered on the previous Friday, would have been untimely and improper. *See Cook*, 361 S.W.3d at 240-41; *Wood*, 87 S.W.3d at 739; *see also Ex parte McIver*, 586 S.W.2d 851, 854 (Tex. Crim. App. 1979) ("Courts have no power to change a jury verdict unless it is with the jury's consent and before they have dispersed."); *State v. Dudley*, 223 S.W.3d 717, 721-23 (Tex. App.—Tyler 2007, no pet.) (holding that defendant's sentence could not be changed when, days after jury's verdict, State filed affidavits from eleven jurors stating that punishment verdict they had rendered was not what they had intended). *Cf. Jones v. State*, 511 S.W.2d 514, 516 (Tex. Crim. App. 1974) (no error in requiring jury to re-deliberate when non-unanimous verdict was discovered during jury's show of hands as to whether they agreed with verdict).

11

On this record, we cannot conclude that the district court erred or abused its discretion in entering the verdict. "When the jury agrees upon a verdict . . . and if it states that it has agreed, the verdict shall be read aloud by the judge, the foreman, or the clerk. If in proper form and no juror dissents therefrom, and neither party requests a poll of the jury, the verdict shall be entered upon the minutes of the court." Tex. Code Crim. Proc. art. 37.04. The district court followed that procedure in this case. The jury foreperson announced that the jury had reached a verdict, the verdict as to each count was read aloud by the district court, no juror dissented from the verdict at that time, and neither party requested a poll of the jury. Thus, the district court was presented with a unanimous verdict, and it entered the verdict as it was required to do. *See id.*

We also cannot conclude on this record that the district court abused its discretion in denying Adair's motion for new trial based on jury misconduct. We review a trial court's denial of a motion for new trial under an abuse of discretion standard. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012) (citing *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001)). "We do not substitute our judgment for that of the trial court; rather, we decide whether the trial court's decision was arbitrary or unreasonable." *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). A trial court abuses its discretion in denying a motion for new trial when no reasonable view of the record could support the trial court's ruling. *McQuarrie*, 380 S.W.3d at 150; *Holden*, 201 S.W.3d at 763; *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004).

To support a motion for new trial based on jury misconduct, the moving party must provide juror affidavits or other evidence tending to show that the alleged misconduct occurred. *See Tinker v. State*, 148 S.W.3d 666, 673 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Hines*

12

*v. State*, 3 S.W.3d 618, 623 (Tex. App.—Texarkana 1999, pet. ref'd). But, any such evidence must not violate Rule 606(b), which provides:

> Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment. Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes. However, a juror may testify: (1) whether any outside influence was improperly brought to bear on any juror; or (2) to rebut a claim that the juror was not qualified to serve.

Tex. R. Evid. 606(b); *see Tinker*, 148 S.W.3d at 673; *Ford v. State*, 129 S.W.3d 541, 549-51 (Tex. App.—Dallas 2003, pet. ref'd); *Hines*, 3 S.W.3d at 623; *Sanders v. State*, 1 S.W.3d 885, 887-88 (Tex. App.—Austin 1999, no pet.).

In this case, Adair attached to his motion for new trial an affidavit from the juror who had earlier written the note complaining of the verdict. The affidavit included detailed information describing events during the jury's deliberations. At the hearing on the motion for new trial, Adair also asked the district court to consider the earlier note that the juror had written. The State moved to quash both documents, and the district court granted the motion. The district court would not have abused its discretion in concluding that both documents violated Rule 606(b) by describing what the juror claimed had occurred during the jury deliberation process, and in excluding the documents on that ground.[1] *See* Tex. R. Evid. 606(b); *Romero v. State*, 396 S.W.3d 136, 151-52

---

[1] In his brief, Adair asserts that the State waived any Rule 606(b) objection to the juror's note by not earlier objecting to its consideration at the time the note was read into the record during trial. *See Salazar v. State*, 38 S.W.3d 141, 148 n.3 (Tex. Crim. App. 2001) (stating that "any potential 606(b) objection was waived by both parties when they withdrew their initial objections").

(Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *Tinker*, 148 S.W.3d at 673; *Ford*, 129 S.W.3d at 550-51.  As those documents were the only possible evidence supporting Adair's claim that the verdict was not unanimous, we cannot conclude on this record that the district court abused its discretion in denying Adair's motion for new trial.

Adair further asserts that Rule 606(b) does not apply in this case because, in his view, "this issue is not about the [jury] deliberations themselves, but rather focuses upon the erroneous declaration in open court by the jury foreman that the verdicts were unanimous."  We disagree. Rule 606(b) does apply in this case, because the only documents in the record tending to show that the foreman's declaration of unanimity was erroneous are the note and the affidavit from the complaining juror, both of which violate Rule 606(b).  *See* Tex. R. Evid. 606(b); *Hicks v. State*, 15 S.W.3d 626, 630-31 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd); *see also Washington v. State*, No. 11-03-00153-CR, 2004 Tex. App. LEXIS 1082, at *1-3 (Tex. App.—Eastland Feb. 5, 2004, pet. ref'd) (per curiam) (not designated for publication).  Moreover, the record supports the district court's finding that the verdict on each count was in fact unanimous as the foreman had

---

However, the record reflects that no such waiver occurred here.  By reading the note into the record, the district court was merely disclosing to the parties the contents of the note in order to facilitate the discussion regarding how the district court should proceed; it did not purport to admit it into evidence.  The district court explained,

> I don't believe in hiding anything, and so what I wanted to do was to see what you all came up with as far as law, and so the only way I know to be completely honest with everybody is to read to you what the juror wrote Friday, and that's what I'm going to read to you right now and then we'll discuss this further.

The note was offered into evidence for the first time at the hearing on the motion for new trial, and the record reflects that the State objected at that time.  Thus, there was no waiver.

declared. The complaining juror had raised her hand with the other jurors when the district court had asked the jurors if the guilty verdict "accurately reflects your verdict," and she later answered, "Yes, ma'am," when asked by the district court if the sentencing verdict that was announced, which included the earlier finding of guilt, was her verdict "on both counts." In fact, all twelve of the jurors answered that question in the affirmative. We overrule Adair's second issue.

**Admissibility of evidence related to Adair's pre-arrest interview with police**

We next address Adair's first and fourth issues. In Adair's first issue, he asserts that the district court abused its discretion in allowing Detective Wade to testify to a statement made by Adair during a non-custodial interview that, in Adair's view, implicated his right to remain silent. In Adair's fourth issue, he asserts that the district court abused its discretion in allowing Wade to testify that Adair had an attorney present during the interview.

The parties discussed the admissibility of this evidence in a bench conference outside the presence of the jury. The record reflects that the following occurred:

| [The Court]: | So, specifically, you want to ask [Wade] if the defendant gave a statement, right? |
|---|---|
| [Prosecutor]: | I'm going to ask the witness if the defendant was allowed an opportunity to give a statement. I would like the witness to describe that the defendant came in to the sheriff's department with an attorney, that he invoked [] his right to remain silent, within his rights, and declined to answer any questions—he did answer a few questions and I would like to ask the witness what questions he answered and then ask the witness did he decline to answer any further questions and the answer to that is yes. . . . I do believe the jury is entitled to know that the defendant was given an opportunity to make a statement, he came in properly with his counsel and he answered some questions and he refused to answer others. |

15

| | |
|---|---|
| [The Court]: | Or declined to answer. |
| [Defense counsel]: | Your Honor, that constitutes a comment on his right to remain silent. The fact that we said it in voir dire is one thing. |
| [The Court]: | I'm saying that . . . you explained what the Fifth Amendment right is in voir dire and I don't want to get into anymore discussion in front of the jury. But you're saying what he would say would be a comment? |
| [Defense counsel]: | Yeah, because it's being put into the concept that he got all lawyered up and he came in— |
| [The Court]: | Well that's his right. |
| [Defense counsel]: | —and he answered a couple of questions. It's a comment to have testimony that he came in and exercised his right. It gives it a different nuance than what it has now. It's just his right to remain silent and he didn't make a statement. |
| [The Court]: | Overruled. When we come back she can ask those limited questions, did he have an opportunity, did he come in, did he answer a few questions, did the interview cease. Don't say he claimed his Fifth, just say— |
| [Prosecutor]: | And to be clear, Your Honor, the defendant never said I would like to invoke my Fifth Amendment Right, he never said that. |
| [The Court]: | Just those limited things, that's it. |

The State then proceeded to elicit testimony from Wade that, prior to Adair's arrest, Adair provided a voluntary statement at the sheriff's department. According to Wade, Adair was not in custody at the time of his statement and was free to go, but Adair had nevertheless been advised of his *Miranda* rights prior to providing the statement.[2] During Wade's testimony, he was asked if Adair had "an

---

[2] All references to *Miranda* refer to *Miranda v. Arizona*, 384 U.S. 436, 467-73 (1966).

16

attorney present with him" during the interview. Wade answered, "Yes, he did." The following testimony was then elicited:

Q.    Did the defendant answer any of your questions that you proposed to him?

A.    Just a couple.

Q.    Can you tell the jury what questions he answered?

A.    One was if he was aware of the allegations made against him.

Q.    And his response was?

A.    He believed it was some type of sexual assault or child indecency.

Q.    Was he aware of who had made the allegation against him?

A.    Yes.

Q.    He knew that [it] was his granddaughter [G.T.]?

A.    Correct.

Q.    Did the defendant acknowledge that he had been confronted by his wife Paula about the allegations?

A.    Yes, he did.

Q.    Did he acknowledge having a conversation with Paula when confronted with the allegations?

A.    Yes.

Q.    Did he give you any details about that conversation?

A.    No, he did not.

Q.    Did you outline for him the allegations that had been made against him?

A.    Yes, I did.

Q.  And did he decline to make any comment or offer any statement regarding those allegations?

A.  He offered no answers for them.

The State then moved on to a different line of questioning.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). The test for abuse of discretion is whether the trial court acted arbitrarily or unreasonably, without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). A trial court abuses its discretion only when its decision "is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). Moreover, we must sustain a trial court's ruling admitting or excluding evidence on any theory of law applicable to the case. *See Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990).

We first address the admissibility of Wade's testimony that Adair "offered no answers" for the sexual-assault allegations. Adair contended below that the admission of this testimony violated his Fifth Amendment right to remain silent. *See* U.S. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself.").[3] In Adair's

---

[3] On appeal, Adair also asserts that the admission of the testimony violated his rights to due process and fundamental fairness under the 14th Amendment. *See* U.S. Const. amend. XIV; *Doyle v. Ohio*, 426 U.S. 610, 617-18 (1976). However, Adair did not raise these specific objections at trial. Thus, any error in admitting the testimony on these grounds has been forfeited. *See* Tex. R. App. P. 33.1(a)(1)(A); *Clark v. State*, 365 S.W.3d 333, 339-40 (Tex. Crim. App. 2012).

Adair also asserts on appeal that the admission of the testimony violated his privilege against self-incrimination provided by the Texas Constitution. *See* Tex. Const. art. I, § 10. Again,

18

view, the testimony was inadmissible because it was a comment on Adair's invocation of his right to remain silent, following Adair's receipt of *Miranda* warnings advising him that the invocation of his right to remain silent would not be used against him.

As a general rule, a defendant's invocation of his right to remain silent, after he has been arrested and received his *Miranda* warnings, may not be used against him at trial. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995); *Hampton v. State*, 121 S.W.3d 778, 782-83 (Tex. App.—Austin 2003, pet. ref'd). However, if a defendant invokes his right to remain silent during a police interview prior to his arrest, and prior to being read his *Miranda* warnings, then his silence is admissible in trial as substantive evidence of his guilt, at least in Texas. *See Salinas v. State*, 369 S.W.3d 176, 179 (Tex. Crim. App. 2012), *aff'd on other grounds*, 133 S. Ct. 2174 (June 17, 2013); *Steadman v. State*, 328 S.W.3d 566, 569-70 (Tex. App.—Eastland), *rev'd on other grounds*, 360 S.W.3d 499 (Tex. Crim. App. 2012).[4]  This

---

however, Adair did not object to the testimony on this basis at trial. Although Adair cites to cases in which Texas courts have held that a generic objection based on a defendant's right to remain silent was sufficient to preserve error under the Texas Constitution, *see Samuel v. State*, 688 S.W.2d 492 (Tex. Crim. App. 1985); *Zillender v. State*, 557 S.W.2d 515 (Tex. Crim. App. 1977); *Wyborny v. State*, 209 S.W.3d 285 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd), those cases involved situations in which the specific nature of the defendant's objection was "obvious to the judge and opposing counsel" based on the context in which the complaint was made. *See Samuel*, 688 S.W.2d at 495-96; *Zillender*, 557 S.W.2d at 517; *Wyborny*, 209 S.W.3d at 290-91. In this case, there is no indication in the record that either the district court or the prosecutor was aware that Adair's objection was based on the Texas Constitution. On the contrary, during the bench conference, the district court and the prosecutor referred only to the Fifth Amendment, and Adair did not clarify that his objection encompassed anything other than the Fifth Amendment. Accordingly, any error on state constitutional grounds has also been forfeited on appeal. *See Heidelberg v. State*, 144 S.W.3d 535, 538-43 (Tex. Crim. App. 2004); *see also* Tex. R. App. P. 33.1(a).

[4]  Federal courts of appeals and state courts are split on this issue. *See State v. Lee*, 15 S.W.3d 921, 925 n.5 (Tex. Crim. App. 2000) (collecting cases and noting split of authority). In a recent opinion, the United States Supreme Court had an opportunity to resolve the split of

case presents a different situation than either of the above scenarios. Here, it is undisputed that Adair gave his statement in a non-custodial setting prior to his arrest but after being read his *Miranda* warnings. The admissibility of a defendant's invocation of his right to remain silent in such a situation—during a non-custodial interview prior to arrest (when his invocation of the right to remain silent would normally be admissible), but after being read *Miranda* warnings (when his invocation of the right to remain silent would normally be inadmissible)—has not been squarely addressed by either the United States Supreme Court or any Texas court of which we are aware.[5] However, we need not resolve this issue today because, even assuming that a defendant's invocation of his right to remain silent in such a situation is inadmissible, the record here supports a finding by the district court that Adair had waived his right to remain silent by speaking to Officer Wade and then failed to subsequently invoke that right.

"The fundamental purpose of the Court's decision in *Miranda* was 'to assure that the individual's right to choose between speech and silence remains unfettered throughout

---

authority. *See Salinas v. Texas*, 133 S. Ct. 2174 (June 17, 2013). However, a plurality of the Court found it "unnecessary to reach that question" because the defendant in that case "did not expressly invoke the privilege against self-incrimination . . . ." *Id*. at 2178-79.

[5] In his brief, Adair cites to several cases from federal courts of appeals holding that the invocation of the right to remain silent, prior to arrest, is generally inadmissible. *See, e.g.*, *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000); *United States v. Burson*, 952 F.2d 1196, 1200-01 (10th Cir. 1991); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir. 1989); *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987). The cases to which Adair cites do not announce any specific rule distinguishing between the admissibility of pre-arrest silence absent *Miranda* warnings and pre-arrest silence following the receipt of *Miranda* warnings. We have found only one federal court of appeals that has held specifically that it is the receipt of *Miranda* warnings that prohibits the government from using a suspect's invocation of his right to remain silent against him. *See Kappos v. Hanks*, 54 F.3d 365, 368-69 (7th Cir. 1995) (citing *Fencl v. Abrahamson*, 841 F.2d 760, 764-65 (7th Cir. 1988)).

the interrogation process.'" *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (quoting *Miranda*, 384 U.S. at 469). When an individual chooses to speak with the police, he may be found, based on the totality of the circumstances surrounding the interview, to have impliedly waived his right to remain silent. *See Berghuis v. Thompkins*, 560 U.S. 370, 383-85 (2010); *Moran v. Burbine*, 475 U.S. 412, 421-23 (1986); *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979); *Joseph v. State*, 309 S.W.3d 20, 24-27 (Tex. Crim. App. 2010). In this case, the record supports a finding that such a waiver occurred. According to Officer Wade, Adair went to the sheriff's department to provide a voluntary statement, and had an attorney with him at the time. Then, after being advised of his *Miranda* rights, including the right to remain silent, Adair proceeded to speak to Officer Wade, answering some of the questions asked of him, including that he was aware of the nature of the allegations against him, who had made those allegations, and that he had discussed the allegations with his wife. There is nothing in the record to suggest that Adair's statements to the police were the result of police intimidation or coercion or anything that would render Adair's decision to speak with the police involuntary. Accordingly, on this record, the district court would not have abused its discretion in finding that Adair had waived his right to remain silent. *See Berghuis*, 130 S. Ct. at 2264.

Once the defendant has waived his right to remain silent, his statements to the police are admissible against him. *See Joseph*, 309 S.W.3d at 27; *see also United States v. Pando Franco*, 503 F.3d 389, 397 (5th Cir. 2007) (concluding that by answering some questions after having received *Miranda* warnings, defendant "waived his right to have the entire conversation, including the implicit references to his silence contained therein, used against him as substantive evidence of guilt"). If, after waiving his right to remain silent by speaking to the police, the defendant

21

changes his mind and no longer wishes to speak, he must then affirmatively assert his right to remain silent; "the privilege to avoid self-incrimination is ordinarily not self-executing." *See Johnson v. State*, 357 S.W.3d 653, 657 (Tex. Crim. App. 2012) (citing *Minnesota v. Murphy*, 465 U.S. 420, 427 (1984)). Moreover, the invocation of the right to remain silent must be unequivocal and unambiguous; merely remaining silent in the face of police questioning is not sufficient to invoke the right. *See Berghuis*, 130 S .Ct. at 2259-60; *see also Salinas v. Texas*, 133 S. Ct. 2174, 2182 (June 17, 2013) ("A suspect who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege."); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994) ("A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.").

Here, Wade was asked if Adair "decline[d] to make any comment or offer any statement" regarding the allegations that had been made against him. Wade testified only that Adair "offered no answers for them." Such testimony does not necessarily indicate that Adair had invoked his right to remain silent; it could also indicate that Adair had kept talking and attempted but was unable to explain the allegations. There was no further testimony elicited as to what Adair said or did in response to Wade's questioning.[6] The district court would not have abused its discretion in finding that "offering no answers" to allegations, without more, did not constitute an unambiguous invocation of Adair's right to remain silent so as to render the testimony inadmissible. *See Berghuis*,

---

[6] Additionally, the prosecutor represented during the bench conference, "And to be clear, Your Honor, the defendant never said I would like to invoke my Fifth Amendment Right, he never said that." Adair did not dispute this characterization.

130 S. Ct. at 2259-60 (defendant "not saying anything" during interview does not invoke right to remain silent); *see also United States v. Ramirez*, 79 F.3d 298 (2d Cir. 1996) ("[T]hough a suspect may, if he chooses, selectively waive his Fifth Amendment right by indicating that he will respond to some questions but not to others, his simple failure to respond to one question, after he had responded to others, does not constitute invocation of the right to remain silent."). Accordingly, on this record, we cannot conclude that the district court abused its discretion in admitting the testimony.

Moreover, even assuming that Adair had invoked his right to remain silent, and further assuming that such invocation was inadmissible despite the fact that Adair was not in custody at the time any such invocation was made, we could not conclude on this record that Adair was harmed by the alleged error. A violation of Adair's Fifth Amendment right to remain silent would be constitutional error. *See Ramos*, 245 S.W.3d at 419; *Rodriguez-Flores v. State*, 351 S.W.3d 612, 631 n.26 (Tex. App.—Austin 2011, pet. ref'd). "If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex. R. App. P. 44.2(a); *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007); *see also Chapman v. California*, 386 U.S. 18, 24 (1967). Factors to consider in the harm analysis include "the nature of the error (e.g., erroneous admission or exclusion of evidence, objectionable jury argument, etc.), whether it was emphasized by the State, the probable implications of the error, and the weight the jury would likely have assigned to it in the course of its deliberations." *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011). The above factors "are not exclusive considerations in any particular case; many

other considerations may logically serve to inform a proper harm analysis in a given case." *Id*. "At bottom, an analysis for whether a particular constitutional error is harmless should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment.'" *Id*. (quoting Tex. R. App. P. 44.2(a)).

Here, the nature of the alleged error was the admission into evidence of Wade's testimony that Adair "offered no answers" to G.T.'s allegations. As we have already explained, this testimony was ambiguous and never clarified. Thus, the jury would not have necessarily interpreted it as silence. Moreover, Wade's testimony encompassed the entire investigation, including interviews with multiple witnesses, but his testimony concerning the interview with Adair was limited by the district court as indicated above. Following that limited testimony, the State then moved on to other aspects of the investigation. In the context of the other testimony presented at trial, Wade's testimony appears to have been offered primarily to describe the sequence of events that Wade and others undertook during the course of the investigation. In other words, the testimony was intended by the State to give the jury a better sense of how the investigation proceeded after the outcry was made, and that is likely how the jury would have considered it during its deliberations, especially since the testimony was not emphasized by the State. The prosecution did not mention any aspect of the interview during its closing argument or at any other point in the proceedings. Instead, the State's focus throughout trial was on G.T.'s testimony, what she had said to others about the abuse prior to trial, and the consistency of her description of the abuse to various witnesses, including her repeated use of the word "rape." Additionally, prior to Wade's testimony, the jury had already heard testimony from Miller that Adair, in response to the allegations, had told his

24

wife Paula that he had "never full blown raped that child." That is vivid testimony to which the jury likely would have given more weight during its deliberations than any testimony by Wade. In fact, the record reveals that during its deliberations, the jury submitted a question to the district court asking the court for a transcript of Miller's testimony, specifically "what [G.T.] said to [Miller], what [Miller] said to Paula and what Paula said to [Adair]." This appears to be a reference to the testimony immediately preceding Adair's "full blown rape" statement, which suggests that this is the testimony on which the jury was focused.[7] Finally, we observe that this is not a case in which the testimony of the victim was equivocal, vague, or indefinite concerning what had occurred. G.T. described in graphic detail what she claimed Adair had done to her, the manner in which he did it, the specific location where the rape was committed, and the time period during which the totality of the alleged abuse occurred. On this record, we are persuaded beyond a reasonable doubt that any error in admitting the evidence did not contribute to Adair's conviction or punishment. *See* Tex. R. App. P. 44.2. We overrule Adair's first issue.

We next address Adair's fourth issue, in which he asserts that the district court abused its discretion in admitting Wade's testimony that Adair had an attorney present during the interview. Specifically, Adair contends on appeal that the admission of this testimony violated article 38.38 of the Code of Criminal Procedure, which provides, "Evidence that a person has contacted or retained an attorney is not admissible on the issue of whether the person committed a criminal offense. In a criminal case, neither the judge nor the attorney representing the state may comment on the

_____

[7] The district court declined to provide the transcript, considering the request to be insufficiently specific. The jury also asked to see a portion of Graber's testimony relating to her interview with G.T. The jury asked no questions concerning any portion of Wade's testimony.

25

fact that the defendant has contacted or retained an attorney in the case." Tex. Code Crim. Proc. art. 38.38. The State argues that Adair failed to preserve error as to any violation of article 38.38 by not referencing the statute in his objection. Instead, Adair objected on the ground that Wade's testimony "put into the concept that he got all lawyered up."

Assuming without deciding that Adair's objection was sufficiently specific to preserve error, we cannot conclude on this record that Adair was harmed by the alleged error. Because the error, if any, would have been based on a statutory violation, it would be subject to the harm analysis for non-constitutional error. Non-constitutional error "must be disregarded" if it "does not affect substantial rights." Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Motilla v. State*, 78 S.W.3d 352, 355-56 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, voir dire, if applicable, whether the State emphasized the error, and whether there is "overwhelming evidence of guilt." *Id*. at 355-57. Here, the challenged evidence was admitted during Wade's testimony, the subject matter of which was not limited to Wade's interview with Adair but encompassed the entire course of the investigation. Wade's testimony that Adair had a lawyer with him during the interview was limited to a single affirmative answer. The State did not emphasize this evidence and did not mention it during closing argument or at any other

26

point in the proceedings. Also, given the other evidence in the record of Adair's guilt, including the victim's testimony and Adair's statement that he "never full blown raped that child," we cannot conclude that the statutory violation in this case, if any, had a substantial and injurious effect or influence in determining the jury's verdict.

Alternatively, to the extent that Adair's complaint on appeal may be construed as a claim that Wade's testimony violated Adair's constitutional right to counsel, we cannot conclude on this record that the district court abused its discretion in admitting the testimony over that objection. "Rights to counsel are recognized in the Fifth Amendment, which protects a person from governmental compulsion to be a witness against himself, and in the Sixth Amendment, which provides a defendant a right to assistance of counsel in a criminal prosecution." *Griffith v. State*, 55 S.W.3d 598, 602 (Tex. Crim. App. 2001). Here, the record supports a finding by the district court that Adair's Fifth Amendment right to counsel was not implicated because, according to Wade's undisputed testimony, Adair was not in custody during the interview. *See id*. (Fifth Amendment right to counsel not implicated unless defendant is subject to custodial interrogation). Similarly, the record supports a finding by the district court that Adair's Sixth Amendment right to counsel was also not implicated. "The Right to Counsel Clause of the Sixth Amendment to the United States Constitution . . . protects an accused's right to counsel 'only at or after the time that adversary judicial proceedings have been initiated, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Id*. at 603 (quoting *Kirby v. Illinois*, 406 U.S. 682 (1972)). Here, the record reflects that the interview occurred prior to Adair's arrest and prior to the initiation of any adversarial judicial proceedings. Because neither Adair's Fifth or Sixth Amendment rights to counsel were implicated at the time he was interviewed by Wade, we cannot conclude that

27

the district court abused its discretion in admitting Wade's testimony that Adair had an attorney present with him during the interview.[8] We overrule Adair's fourth issue.

**Ineffective assistance of counsel**

Finally, we address Adair's third issue, in which he asserts that counsel rendered ineffective assistance during trial. Adair claims that trial counsel was ineffective in three ways: (1) he failed to object to testimony by Dr. Carter that, in Adair's view, constituted an opinion on the victim's truthfulness; (2) he failed to object to Carter's qualifications to opine on certain matters; and (3) he failed to object during voir dire to the prosecutor's reference to serial killer Ted Bundy.

To establish that he received ineffective assistance of counsel, Adair must prove by a preponderance of the evidence that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); *Kuhn v. State*, 393 S.W.3d 519, 537 (Tex. App.—Austin 2013, pet. ref'd). Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

---

[8] The admission of testimony tending to show that a defendant invoked his right to counsel after receiving *Miranda* warnings might, in certain circumstances, violate due process. *See Griffith v. State*, 55 S.W.3d 598, 604-05 (Tex. Crim. App. 2001); *Hardie v. State*, 807 S.W.2d 319, 322 (Tex. Crim. App. 1991). However, as we have already explained, Adair did not object at trial on the basis of a due-process violation. Thus, any error on due-process grounds has been forfeited. *See* Tex. R. App. P. 33.1(a)(1)(A); *Clark*, 365 S.W.3d at 339-40.

To prove deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687; *Perez v. State*, 310 S.W.3d 890, 892-93 (Tex. Crim. App. 2010). "To satisfy this prong of the analysis, a defendant 'must show that counsel's representation fell below an objective standard of reasonableness' based upon 'prevailing professional norms.'" *Perez*, 310 S.W.3d at 893 (quoting *Strickland*, 466 U.S. at 688). "For this performance inquiry we consider all of the circumstances, with 'a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Id*. (quoting *Strickland*, 466 U.S. at 688-89).

If the defendant proves that counsel's performance was deficient, he must further demonstrate that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. Therefore, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Rather, a defendant must show that there is a reasonable probability, meaning a probability sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for the unprofessional errors of counsel. *Id*. at 687.

For a claim of ineffective assistance of counsel to succeed on appeal, the record must demonstrate both deficient performance by counsel and prejudice suffered by the defendant. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). An ineffective-assistance claim must be "firmly founded in the record," and "the record must affirmatively demonstrate" the meritorious nature of the claim. *Id*. (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim.

29

App. 1999)). "Direct appeal is usually an inadequate vehicle for raising such a claim because the record is generally undeveloped." *Id*. This statement is true with regard to the "deficient performance" prong of the inquiry, when counsel's reasons for failing to do something do not appear in the record. *Id*. Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Id*. (quoting *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003)). If trial counsel is not given that opportunity, then the appellate court should not find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Id*. (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). In other words, in the absence of a record explaining the reasons for counsel's decisions, we will not find counsel's performance deficient if any reasonably sound strategic motivation can be imagined. *See Garcia*, 57 S.W.3d at 440.

### Carter's testimony relating to characteristics of a victim

Adair first asserts that trial counsel should have objected to testimony by Dr. Carter relating to the characteristics of child victims of sexual abuse. Carter testified that "about 80 to 90 percent of the time" in child-sex-abuse cases, there is "a pre-existing relationship" between the perpetrator and the child. This relationship, Carter explained, makes it difficult for the child to tell others about the abuse, particularly when the perpetrator is a close family member such as a grandfather. Carter also testified that if the victim first reports the abuse to a child sibling, and if the sibling does not believe the victim or refuses to say anything to adults, this causes the victim to feel helpless and discourages her from telling others. Carter further opined that if the victim eventually told her grandfather to stop, and if he stopped, the victim might think that the abuse is over, try to

move on with her life, and not talk about the abuse again until years later. When the victim does decide to talk about the abuse, Carter added, she might have difficulty remembering the details of what had happened and might also experience difficulty in testifying about the abuse in court. Carter also testified that when the victim first reports the abuse to another child, it is less likely that the child is lying on behalf of an adult. Finally, the State asked Carter the following question: "Is it possible to conclude from the research that you have familiarized yourself with that when a child says that she's been abused that there is a distinct possibility that she has been abused?" Carter answered, "Yes, that's certainly a very real possibility." In Adair's view, the above testimony was tantamount to testifying that the victim was telling the truth.

Expert testimony is admissible where specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue. Tex. R. Evid. 702. Expert testimony does not assist a jury if it constitutes "a direct opinion on the truthfulness" of a child complainant's allegations. *Schutz v. State*, 957 S.W.2d 52, 59 (Tex. Crim. App. 1997) (quoting *Yount v. State*, 872 S.W.2d 706, 708 (Tex. Crim. App. 1993)). The State may not elicit testimony that a particular child is telling the truth or that child complainants as a class are worthy of belief. *Yount*, 872 S.W.2d at 712. However, testimony about the behavior of child-sex-abuse victims generally is admissible under Rule 702. *Cohn v. State*, 849 S.W.2d 817, 818 (Tex. Crim. App. 1993); *Shaw v. State*, 329 S.W.3d 645, 651 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). This includes testimony explaining that a child exhibits behavioral characteristics that have been empirically shown to be common among children who have been abused and testimony concerning the typical characteristics of victims of sexual abuse. *See Schutz*, 957 S.W.2d at 69;

31

*Cohn*, 849 S.W.2d at 819; *Hitt v. State*, 53 S.W.3d 697, 707 (Tex. App.—Austin 2001, pet. ref'd); *Vasquez v. State*, 975 S.W.2d 415, 417 (Tex. App.—Austin 1998, pet. ref'd).

Adair compares Carter's testimony to the testimony that was found inadmissible in *Sessums v. State*, 129 S.W.3d 242 (Tex. App.—Texarkana 2004, pet. ref'd), and *Edwards v. State*, 107 S.W.3d 107 (Tex. App.—Texarkana 2003, pet. ref'd). In both of those cases, expert witnesses either testified that the victim exhibited characteristics of truthfulness or opined that they believed the victim to be telling the truth. *See Sessums*, 129 S.W.3d at 247-48; *Edwards*, 107 S.W.3d at 115-16. In this case, counsel would not have been deficient in concluding that Carter's testimony failed to rise to that level. Carter did not testify either that the victim displayed characteristics of truthfulness or that she was being truthful. In fact, at the beginning of his testimony, Carter expressly testified that he had not interviewed or evaluated either the victim or the defendant in this case, and he agreed with the prosecutor that he was "not here to tell the jury whether or not an assault occurred between Mr. Adair and [G.T.]" Instead, he testified that his role was to help the jury "understand all the various, complex dynamics that are applied in sexual abuse cases." Similar testimony has repeatedly been held to be admissible in other cases. *See, e.g.*, *Cohn*, 849 S.W.2d at 820-21; *Chavez v. State*, 324 S.W.3d 785, 789 (Tex. App.—Eastland 2010, no pet.); *DeLeon v. State*, 322 S.W.3d 375, 382-83 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *Reyes v. State*, 274 S.W.3d 724, 730 (Tex. App.—San Antonio 2008, pet. ref'd); *Warren v. State*, 236 S.W.3d 844, 849 (Tex. App.—Texarkana 2007, no pet.); *Perez v. State*, 113 S.W.3d 819, 831-35 (Tex. App.—Austin 2003, pet. ref'd), *overruled on other grounds by Taylor v. State*, 268 S.W.3d 571, 587 (Tex. Crim. App. 2008); *Gonzales v. State*, 4 S.W.3d 406, 417-18 (Tex. App.—Waco 1999, no pet.); *Vasquez*, 975 S.W.2d at 418-19; *see also Kirkpatrick v. State*, 747 S.W.2d 833, 835-36 (Tex. App.—Dallas

1987, pet. ref'd) (explaining why such testimony is generally admissible and distinguishing between inadmissible and admissible opinion testimony). We cannot conclude that counsel's failure to object to such testimony in this case fell below an objective standard of reasonableness. *See Ex parte Jimenez*, 364 S.W.3d 866, 887 (Tex. Crim. App. 2012); *Muniz v. State*, 851 S.W.2d 238, 258 (Tex. Crim. App. 1993). Moreover, counsel could have had a strategic reason for not objecting to the testimony. The record reveals that counsel conducted an extensive and thorough cross-examination of Carter, which included using hypothetical scenarios similar to the scenarios posed by the prosecutor. Counsel could have reasonably concluded that by limiting her objections to Carter's testimony on direct, her subsequent cross-examination of Carter, in which counsel used Carter's expertise to support the defensive theory of the case, would be more persuasive.

### Carter's testimony relating to characteristics of a perpetrator

Carter was asked to describe how a hypothetical perpetrator would behave in response to the victim not reporting the abuse. Carter testified that such an abuser would "feel emboldened," think that he was "getting away with it," and would be encouraged to continue the abuse. Counsel did not object to this testimony, and Adair asserts that counsel should have objected that Carter was not qualified to render an opinion on the matter. Carter was later asked to opine on the meaning of a statement by a hypothetical perpetrator, in response to being confronted regarding the abuse, that he "didn't full blown rape the child." Carter testified that he would find such a statement "to be interesting" and "would question the acknowledgment of at least something happening on the part of the accused." Counsel objected to this testimony on the basis that it misstated the evidence (which the district court overruled), but Adair asserts on appeal that counsel should have further objected

33

on the basis that Carter was not qualified to "read Thomas Adair's mind and render a conclusion as [to] what Mr. Adair meant if he in fact made the statement."

We cannot conclude that counsel's performance was deficient in failing to object to Carter's qualifications to render the above opinions. At the beginning of his testimony, Carter testified extensively regarding his qualifications, including that since 1983, he has been licensed by the State of Texas as a psychologist; that since the 1990s, he has been involved in the "long-term treatment of sexually abused patients"; that, over the course of his career, he has treated "many hundreds" of sexual-abuse victims and performed "probably 6 to 8,000" psychological evaluations; that he has also conducted evaluations on perpetrators of sexual abuse; that he has studied the characteristics of individuals who sexually assault children; and that he has testified in court cases involving child sexual abuse "over 200 times." Based on this and other evidence, the district court would not have abused its discretion in finding that Carter was qualified to render an opinion on the characteristics of perpetrators of child sexual abuse and on the possible meaning of a perpetrator's statement in response to being confronted with allegations of such abuse. Thus, we cannot conclude that counsel was deficient in declining to object to Carter's qualifications. *See Jensen v. State*, 66 S.W.3d 528, 543 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("Appellant has not demonstrated that the trial court would have sustained an objection to [the expert's] qualifications. Therefore, appellant has not met the burden of proving his trial counsel was ineffective for failing to object."). Additionally, as noted above, counsel conducted an extensive and thorough cross-examination of Carter, and counsel could have made a strategic decision not to object to Carter's qualifications so that counsel could elicit expert opinions from Carter on cross-examination that were favorable to the defensive theory of the case.

34

*Reference to Ted Bundy*

During jury selection, the prosecutor showed the venire a photograph of an unnamed individual. The prosecutor then identified the individual as serial killer Ted Bundy and proceeded to question the panel as to whether they could tell "from looking at the picture that he was a serial killer." The prosecutor subsequently asked the panel questions regarding what "child molesters" look like, concluding with the following: "Is there anyone here who believes that people of a certain category, certain occupation, certain gender, certain sociable status, certain religious beliefs, that they could never sexually assault a child? Can you think of any examples? Policemen would never do that. Priests never would do that." Adair characterizes the prosecutor's use of the photograph and questioning of the venire as "comparing Adair to Ted Bundy" and claims that trial counsel was ineffective in failing to object to that characterization.

We disagree. In contending that the prosecutor's conduct was impermissible, Adair cites to cases in which courts have held that it is improper, during closing argument, for the State to compare the defendant to notorious criminals. *See, e.g.*, *Gonzalez v. State*, 115 S.W.3d 278, 284-85 (Tex. App.—Corpus Christi 2003, pet. ref'd) (comparing defendant to Osama bin Laden); *Brown v. State*, 978 S.W.2d 708, 714 (Tex. App.—Amarillo 1998, pet. ref'd) (comparing defendant to Jeffrey Dahmer, John Wayne Gacy, and Ted Bundy); *Stell v. State*, 711 S.W.2d 746, 748-49 (Tex. App.—Corpus Christi 1986, no pet.) (comparing defendant to Lee Harvey Oswald). The rationale is that such arguments are based on evidence outside the record. *See Gonzalez*, 115 S.W.3d at 284. "The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may 'arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence.'" *Campbell v. State*, 610 S.W.2d 754, 756

35

(Tex. Crim. App. 1980) (quoting *Stearn v. State*, 487 S.W.2d 734, 736 (Tex. Crim. App. 1972)). Thus, if the prosecutor had compared Adair to Ted Bundy during closing argument, that might have been the basis for a legitimate objection by counsel.

In this case, however, we are dealing with jury selection, not jury argument. The purpose of voir dire is different than the purpose of argument. Voir dire encompasses at least three objectives: (1) to elicit information that would establish a basis for a challenge for cause because the venireman is legally disqualified from serving or is biased or prejudiced for or against one of the parties or some aspect of the relevant law; (2) to facilitate the intelligent use of peremptory challenges that may be "exercised without a reason stated, without inquiry and without being subject to the court's control"; and (3) to indoctrinate the jurors on the party's theory of the case and to establish rapport with the prospective jury members. *See Sanchez v. State*, 165 S.W.3d 707, 710-11 (Tex. Crim. App. 2005). Here, part of the State's theory of the case was that Adair, the victim's grandfather, was capable of sexually assaulting his granddaughter, despite his appearance and familial status. Thus, it would not fall below an objective standard of reasonableness for counsel to conclude that the prosecutor's questioning was a permissible attempt to use a photograph of Bundy to illustrate that appearances can be deceiving, and to attempt to discern the panel's views on that and other issues applicable to the case. *See Wingo v. State*, 189 S.W.3d 270, 271 (Tex. Crim. App. 2006) ("A question may be proper if it seeks to discover a juror's views on an issue applicable to the case."). Additionally, counsel could have had a strategic reason for not objecting. Specifically, counsel, too, might have wanted to know how the venire would respond to the prosecutor's reference to Bundy so that counsel could intelligently exercise her peremptory

challenges.  Accordingly, we cannot conclude that counsel was ineffective in declining to object to the prosecutor's questioning.  We overrule Adair's third issue.

**CONCLUSION**

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Rose

Affirmed

Filed:   December 12, 2013

Do Not Publish